STATE of Minnesota, Respondent,

v.

Charles Franklin ZUPETZ, Appellant.

No. 81–769.

Supreme Court of Minnesota.

Aug. 13, 1982.

Lucas & Carlson and Robert E. Lucas, Duluth, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Alan L. Mitchell, County Atty., and Mark S. Rubin, Asst. County Atty., Duluth, for respondent.

AMDAHL, Chief Justice.

This is an appeal from the denial of appellant Charles Franklin Zupetz' motion for a new trial or to vacate the judgment of

conviction of attempted manslaughter in the second degree.

On August 1, 1980, at about 10:30 p. m., Charles Zupetz shot Jane Hartley. He was charged with attempted murder in the first degree, assault in the first degree, and possession of a firearm without a permit. The state later dropped the assault charge on the theory that it was a lesser and included offense of attempted murder in the first degree. Trial began on the remaining two counts on March 30, 1981. On April 3, the jury returned a verdict of guilty of attempted manslaughter in the second degree and possession of a firearm without a permit.

The facts are essentially undisputed. Zupetz met the victim, Jane Hartley, in the fall of 1977. Hartley was then living in Minneapolis in order to attend the University of Minnesota, but moved to Virginia where Zupetz lived in 1978.

On September 26, 1979, Zupetz purchased a .357 magnum handgun; later, he bought some .357 hollow-point shells at another gun shop. No other types of shells were available at that shop.

By early 1980, he had developed a drinking problem. His drinking began to affect his relationship with Hartley and with his family, and he also began to have financial problems. His relation with Hartley continued until several months before the shooting. Occasionally they had violent fights; Zupetz struck Hartley on three occasions. Hartley sometimes became physically violent as well. Generally one or both of them had been drinking when these incidents occurred. The usual reason for the fights was Zupetz' jealousy; he disapproved of Hartley's going downtown to bars with her girlfriends and socializing with other men. Hartley and Zupetz had discussed marriage, but they finally stopped seeing each other when Hartley decided that she could no longer "put up with" the double standard that he imposed on their social life.

At about 10:00 on the night of July 31, 1980, Hartley telephoned Zupetz to see "how he was doing." Zupetz was out, so

Hartley left a message with Zupetz' roommate that she had called. Zupetz returned home at about midnight and went directly to bed without seeing the message from Hartley. The following morning, August 1, he found the message, which said "Jane called twice," and "meet me at the Magic." At about 9 a. m., Zupetz want to the Magic Bar and began drinking beer. His roommate, Tom Hines, arrived at the bar about 1:00 in the afternoon to meet Zupetz because they had planned on leaving that afternoon to go to Zupetz' boss' cabin for the weekend. Zupetz started drinking vodka at about that time. He stated that he did not recall leaving the Magic Bar that evening; the next thing he claims to remember clearly was awakening in the city jail.

Jane Hartley worked until 4:20 on August 1. After supper she went with her sister and some friends to a softball tournament. After the tournament, at about 9 p. m., they went to the Sports Page Bar in downtown Virginia. While they were looking for a place to park, Hartley and her sister saw Zupetz in his truck, but they made no attempt to get his attention. Hartley stated that she preferred to avoid him downtown because "there had been scenes" when they saw each other downtown on other occasions.

After leaving the Sports Page Bar sometime later, Hartley, her sister, and five friends walked in a group toward another bar, the Eldorado. Hartley said that she did not want to go into the Eldorado because she thought Zupetz might be there and she did not want to see him. The group agreed to go elsewhere.

In the middle of the next block, two more of Hartley's friends, Rose Hines and Adrianne Edwards, ran up to the group and said to Hartley, "Run;" "Charlie's coming;" "He has a gun." Ann Hartley testified, over defense counsel's objection, that one of them said Zupetz had a gun "and that he had said earlier that he was going to blow Jane away. I remember the exact words they used. They repeated it maybe three times." Hartley stated that she did not

believe them. She said, "I'm not scared of Charlie, Rose." Zupetz came down the street immediately behind them. He had been with Adrianne Edwards and Rose Hines at the Eldorado Bar until about 9:30. While at the bar, he told Rose that he had a gun. He also mentioned that he was looking for Jane Hartley; later he told Rose that "he was in love with Jane" and that "she would probably be the only girl he would ever love as much as he did." Zupetz approached the group; he did not seem to notice Hartley, however, until she spoke to him. Zupetz then drew Hartley away from the group, saying "I want you to come with me." Hartley replied that she wanted to stay with her friends but that he was welcome to come with them to the Magic Bar. Hartley further testified as follows:

> He said he didn't want to do that, then he said, "I have decided that I'm going to have to kill you." He said, "I have thought about it, and I have decided that's what I have to do."

Hartley said that she tried to change the subject. Presently Hartley's sister Ann came up to them and urged Hartley to come with her. Hartley said she would talk to Zupetz for a few more minutes.

Then Zupetz put his arms around Hartley and said "Oh, I love you." She did not repel him. They remained in this position for 10 or 15 minutes. Zupetz told Hartley, "I have a gun; don't you believe me? I will show it to you," and pulled the .357 magnum out of the waistband of his pants. She told him to put it away. Instead, he waved it up in the air and brought it back down. Witnesses stated that the gun was pointing downward rather than at Hartley. Zupetz appeared to be looking down the street; he was not looking directly at Hartley. The gun went off and Hartley slumped back into a doorway. Realizing that she had been shot, she said "Help me, call an ambulance." Zupetz knelt down next to her, called for an ambulance, and yelled at people to get out of the way.

A police officer who had been directed to the scene of the incident found Hartley lying in the doorway and Zupetz standing next to her. When the officer approached the doorway and asked Zupetz what happened, Zupetz replied, "Never mind, everything is all right." The officer tried to question him, but he kept insisting that he get the people away and call an ambulance. Zupetz remained belligerent after the ambulance arrived. He tried to get into the ambulance and would not let the officer enter the landing area up the stairs from the doorway. Another police officer found Zupetz' gun on the stairway landing above the doorway where Hartley was shot.

The state's firearms expert testified that when she received the gun from the Virginia police, it contained five unfired rounds of copper-jacketed hollow-point bullets in the five chambers and one fired round in the chamber under the firing pin. The gun had a double action, meaning that if cocked by pulling back the hammer, it could be fired by pulling the trigger; it could also be cocked and fired by pulling the trigger even when the hammer is not pulled back. The expert testified that if the gun had been cocked, 4.7 to 4.9 pounds of pressure on the trigger would have caused the gun to fire, while at least 14 pounds of pressure would have been necessary if the gun had not been cocked. She also testified that it would not be safe to carry a loaded gun of this type in a cocked position in the waistband of one's pants. There was no way to ascertain whether Zupetz had cocked the gun before pulling the trigger.

The physician who treated Jane Hartley testified that the bullet entered her body directly above the pubic bone, and traveled downward and went through the upper part of the hip bone. By the time of trial she had recovered completely, with residual effects limited to some possible constriction in the hip area.

Jane Hartley had given one oral and three written statements to the Virginia Police Department. In the first written statement she said "All I know is that I'm sure that at the instant the gun fired, it was accidental." In another statement, she said: "And then it kind of slipped and I

think it accidentally went off because I know that he didn't aim it at me and shoot it at me." She also testified at trial that it was her opinion that the shooting was an accident. Rosemary Hines also testified that she did not believe Zupetz intended to hurt Hartley. Hines stated that she believed that Zupetz was very drunk. Ann Hartley also had the impression that Zupetz was intoxicated.

At the conclusion of the trial, the jury was given the following list of offenses of which Zupetz could be convicted:

1) Attempted murder in the first degree.
2) Attempted murder in the second degree.
3) Attempted manslaughter in the first degree.
4) Attempted manslaughter in the second degree.
5) Assault in the first degree.
6) Assault in the second degree.
7) Reckless handling of a dangerous weapon.
8) Not guilty.

The jury returned a verdict of guilty of attempted manslaughter in the second degree and possession of a handgun without a permit.

Appellant argues that there is no such crime as attempted second-degree manslaughter because an attempt requires specific intent, which is not an element of the crime of second-degree manslaughter. We agree, and accordingly reverse appellant's conviction.

Minn.Stat. § 609.17 (1980) defines an attempt as follows:

Whoever, *with intent to commit a crime*, does an act which is a substantial step toward, and more than preparation for, the commission of the crime is guilty of an attempt to commit that crime * *. (Emphasis added.)

*Id.* subd. 1. The crime of manslaughter in the second degree is defined, in part, as follows:

Whoever causes the death of another by any of the following means is guilty of manslaughter in the second degree * * *:

(1) By his culpable negligence whereby he creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another.

Minn.Stat. § 609.205 (1980).

The jury received the following instructions on culpable negligence:

Culpable negligence is more than ordinary negligence. It is gross negligence coupled with the elements of recklessness. It is intentional conduct which an actor may not intend to be harmful, but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others.

This instruction is based on language in *State v. Beilke*, 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964). The state contends that the *Beilke* definition of culpable negligence involves "intentional conduct," that intent is an element of second-degree manslaughter, and that therefore one may intend to commit that crime in such a manner as to make possible an attempt as defined by section 609.17.

"Recklessness" and "negligence" may be defined in the following manner:

A person acts "recklessly" when he consciously disregards a substantial and unjustifiable risk that the element of an offense exists or will result from his conduct; the risk must be of such a nature and degree that its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation. A person acts "negligently" when he should be aware of a substantial and unjustifiable risk that the element of an offense exists or will result from his conduct; the risk must be of such a nature and degree that his failure to perceive it involves a gross deviation from the standard of care that a reasonable person would observe in the actor's situation. The difference between the terms "recklessly" and "negligently," as thus defined, is one of kind rather than of degree. Each actor creates a *risk* of harm. The reckless actor is *aware* of the risk and disregards it; the negligent ac-

tor is *not aware* of the risk but should have been aware of it.

2 C. Torcia, *Wharton's Criminal Law* § 168 at 272 (14th ed. 1979) (footnotes omitted) (emphasis in original). Minn.Stat. § 609.-205 (1980) defines second-degree manslaughter in terms of *culpable* negligence whereby the actor *consciously* takes the chance of causing another's death or serious injury; this definition corresponds with "recklessness" as defined by Wharton, *supra*. In *Beilke*, we called this kind of recklessness "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." 267 Minn. at 534, 127 N.W.2d at 521. The question is whether this "intent" is the kind of specific intent needed to give rise to an attempt to commit a particular crime.

> The word "attempt" means to try; it implies an effort to bring about a desired result. Hence an attempt to commit any crime requires a specific intent to commit that particular offense. If other elements of an attempt are established "intent is the crucial question." One does not attempt to commit a crime by negli-

gently endangering the person or property of another however great the danger or extreme the negligence. A few cases can be found in which the court has taken the position that a "reckless disregard of human life may be the equivalent of a specific intent to kill" but this is quite unsound.

R. Perkins, *Criminal Law* at 573–74 (2d ed. 1969) (footnotes omitted).

A number of courts have rejected the idea that one may be convicted of an attempt to commit manslaughter involving culpable negligence; the consensus seems to be that such a crime would be completely illogical because there is no specific intent to commit the reckless or negligent act.[1] In *People v. Van Broussard*, 76 Cal.App.3d 193, 142 Cal.Rptr. 664 (1977), the court stated that "[a]n 'attempt' to commit involuntary manslaughter [2] would require that the defendant intend to perpetrate an unintentional killing—a logical impossibility. * * We conclude that attempted involuntary manslaughter is inherently contradictory and hence not a recognizable crime in California." *Id.* at 197, 142 Cal.Rptr. at 666. In *State v. Howard*, 405 A.2d 206 (Me.1979),

1. A few courts have taken the opposite approach. In *Charlton v. Wainwright*, 588 F.2d 162 (5th Cir. 1979), a habeas corpus case in which Florida law was applied, the court pointed out that "Florida courts have given a special definition to 'culpable negligence.' " Instead of construing it to emphasize involuntary and unintentional behavior, they have construed it to emphasize culpability which rests on intentional, or quasi-intentional, behavior:

> "Culpable negligence" as used in the manslaughter statute means negligence of a gross and flagrant character evincing a reckless disregard of human life or the safety of persons exposed to its dangerous effects, or that entire want of care which would raise the presumption of indifference to consequences; or which shows such wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an *intentional* violation of them.

*Id.* at 164 (citation omitted) (quoting *McCullers v. State*, 206 So.2d 30, 33 (Fla.App.1968)). Accordingly, the court held that a conviction for attempted manslaughter by culpable negligence was valid under Florida law. *Charlton* at 165. In *Taylor v. State*, 401 So.2d 812 (Fla.App.

1981), a Florida appeals court reached the same conclusion. The court commented, however, that:

> There is a certain appeal to appellant's position that one cannot form an intent to commit an involuntary act, but if we start with the premise that there can be an assault with *intent* to commit the same [involuntary] act (manslaughter), then it must follow that there can be an attempt (the formation of an intent) to commit the crime, when the other elements of attempt are present. *Thus precedent, if not logic, requires that we hold that there is a crime of attempted manslaughter in Florida.*

*Id.* at 816 (emphasis added in part).

2. The element of culpable negligence contained in Minn.Stat. § 609.205 (1980) does not appear in the California statute, which defines involuntary manslaughter as a killing committed (a) "in the commission of an unlawful act, not amounting to felony," or (b) "in the commission of a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection." Cal.Penal Code § 192(2) (West 1970).

the Supreme Judicial Court of Maine held that "[t]he crime of manslaughter * * * is predicated upon a different mental state from that found in the attempt statute. Under 17–A M.R.S.A. § 203(1)(A), a person is guilty of manslaughter if he '[r]ecklessly, or with criminal negligence, causes the death of another human being ....' Because of the discrepancy in culpable mental states between criminal attempt on the one hand and manslaughter on the other, the proffered crime of 'attempted manslaughter' is a logical impossibility." *Id.* at 212. The Supreme Judicial Court of Massachusetts held in *Commonwealth v. Hebert*, 373 Mass. 535, 368 N.E.2d 1204 (1977), that "[i]nvoluntary manslaughter is homicide unintentionally caused. Hence an attempt to commit involuntary manslaughter is logically impossible." *Id.* at 1206 (citation omitted). Similarly, in *People v. Brown*, 21 A.D.2d 738, 249 N.Y.S.2d 922 (1964), a New York court stated that "[a]n attempt to commit manslaughter is apparently a contradiction because the specific crime of manslaughter involves no intent and, accordingly, an intention to commit a crime whose distinguishing element is a lack of intent is logically repugnant." *Id.* at 739, 249 N.Y.S.2d at 923. In *Hull v. State*, 553 S.W.2d 90 (Tenn.Cr.App.1977), the Court of Criminal Appeals of Tennessee held that "there is just no such crime as would require proof that one intended a result that accidentally occurred." *Id.* at 94. In a Wisconsin case, *State v. Melvin*, 49 Wis.2d 246, 181 N.W.2d 490 (1970), in which the defendant was charged with attempted homicide by reckless conduct, the court held:

> "An attempt" * * * requires that the actor have an intent to perform acts and attain a result which if accomplished would constitute the crime. Acts to constitute an attempt must unequivocally demonstrate that the actor had such intent and would have committed the crime excepting for the intervention of another person or some other extraneous factor. Homicide by reckless conduct does not require any intent to attain a result which if accomplished would constitute a

crime; and consequently, *one cannot attempt to commit a crime which only requires reckless conduct and not a specific intent.*

*Id.* at 249–250, 181 N.W.2d at 492 (emphasis added).

 Specific intent that would give rise to an attempt to commit a certain crime is the intent to commit that *particular* crime. In Minnesota, second-degree manslaughter is the crime of causing another's death through culpable negligence, creating an unreasonable risk and consciously taking the chance of causing death or serious injury. Minn.Stat. § 609.205 (1980). In this case the jury must have concluded, in effect, that Charles Zupetz specifically *intended* to cause Jane Hartley's death through his culpable negligence whereby he created an unreasonable risk and consciously took the chance of causing her death or injury. As a number of courts have remarked, it seems illogical that someone could intend to cause someone else's death through negligence or even recklessness. In *State v. Dahlstrom*, 276 Minn. 301, 150 N.W.2d 53 (1967), this court commented that "[a]n attempt to commit culpably negligent conduct which does not result in death or physical harm may be criminal." *Id.* at 308, 150 N.W.2d at 59. This statement seems to be a recognition that an "attempt" to be negligent is possible. Nevertheless, in *Beilke*, culpable negligence or recklessness in second-degree manslaughter is described as *intentional conduct that the actor may not intend to be harmful.* This is not the same as specific intent, which is the intent to commit the crime in question. As applied to the instant case, it is likely that Zupetz intended to drink, to load his gun, and to carry it with him in a public place. A jury certainly could find that such intentional conduct was grossly negligent, involving a probability of injury to others. However, we do not believe that Zupetz' intent to use a loaded handgun in what may be characterized as a reckless manner constituted the specific intent to kill Jane Hartley.

■ The state points out that the testimony of two witnesses that Zupetz said he was going to kill Hartley is proof of Zupetz' specific intent to do so. While the evidence indicates that Zupetz may have contemplated killing Hartley, specific intent to kill is not an element of second-degree manslaughter, the crime of which he was found guilty. The state may not make such intent *part of the crime itself* merely by introducing evidence of it. One may reasonably conclude that Zupetz intentionally behaved in a reckless manner. He also may have intended to kill Hartley. But it makes no sense to say that he intended to kill her by being reckless. Therefore we hold that appellant's conviction must be reversed.

Reversed.