STATE of Minnesota, Respondent,

v.

Eugene Dennis MOORE, Appellant.

No. C7–89–1156.

Supreme Court of Minnesota.

July 6, 1990.

John Stuart, State Public Defender, Steve P. Russett, Asst. State Public Defender, St. Paul, for appellant.

Stephen Rathke, Crow Wing County Atty., Brainerd, and Hubert H. Humphrey, III, State Atty. Gen., St. Paul, for respondent.

## OPINION

WAHL, Justice.

Defendant Eugene Dennis Moore was found guilty, after a jury trial, of premeditated murder in the first degree,[1] unintentional murder in the second degree[2] and second degree (culpable negligence) manslaughter,[3] in the November 12, 1988 shooting death of his wife, Debra Moore. He was sentenced to life imprisonment on the first degree murder conviction. Defendant argues on appeal: that he is entitled to a new trial or conviction for a lesser offense because the jury's verdicts of guilty for first degree premeditated murder and second degree manslaughter are legally inconsistent; that he was denied a fair trial and effective assistance of counsel when his attorney conceded his guilt in closing argument; and that the admission of expert testimony on blood splatter interpretation constituted reversible error because the state failed to qualify the testimony as expert testimony, failed to establish that the results of blood splatter analysis are generally accepted in the scientific community and failed to demonstrate that the results in this case were reliable.[4] We reverse and remand for a new trial.

In November 1988, Eugene Moore and Debra Moore had lived a short time in a small house in Brainerd, Minnesota, with five of their eight children. Their three eldest children had been removed from their home a few years earlier while they were living in Oklahoma. Neither of the Moores had held a job since 1980. Between 1:00 p.m. and 10 p.m. on November 11, 1988, the Moores drank two twelve-packs of beer. At approximately 7:00 p.m., Debra Moore put the children to bed. Later she and her husband had an argument. Sometime between 9:00 p.m. and 10:00 p.m., a gun discharged, striking Debra Moore in the chest. She died nearly instantaneously.

Later that night, at 11:07 p.m., the 911 operator in Brainerd received a telephone call from Moore. Moore told the operator that he had shot his wife with a 12 gauge sawed-off shotgun. The telephone call was recorded and traced to John's Tavern in Brainerd. Moore told the dispatcher that he and his wife had gotten into an argument, that she had been threatening to leave him and had threatened to kill him. Police were immediately sent to John's Tavern, but were unable to get inside the bar because of delays caused by a drunken patron. Moore and the patron were having an argument. Moore threw a crockpot behind the bar and also threatened suicide. Approximately 45 minutes after he entered the bar, Moore was arrested.

Moore had given the 911 dispatcher his address and told her where to find his wife's body. The police immediately went over to 1417 Norwood Street. The house was locked and dark. Forcing open two double-sliding doors, the police entered the house through the kitchen where they found Debra Moore dead, her body wrapped in a naugahyde tarp. The police searched the rest of the house and found an infant in a bedroom. Approximately 20 minutes later they found the four other children in a second bedroom, with the door locked from the outside. The police found a 12 gauge sawed-off shotgun on a shelf in the living room. They also found a spent shell and a box of cartridges. Twenty-four empty beer cans were on the kitchen counter. The bathtub was filled with bloods-

---

1. Minn.Stat. § 609.185(1) (1988).

2. Minn.Stat. § 609.19(2) (1988) (unintentional murder while committing or attempting to commit a felony offense).

3. Minn.Stat. § 609.205(1) (1988).

4. Defendant also challenges the sufficiency of the evidence to sustain his conviction for first degree murder and asks this court to reduce his conviction to first or second degree manslaughter but because of our determination that a new trial is required, we do not reach this issue.

tained toys, the sink with bloody water and a towel. The living room had numerous bloodstains on the wall and floor, although a large portion of the living room floor had been wiped clean.

The police discovered, after arresting defendant, that he had a small cut in between his thumb and forefinger. Defendant eventually admitted that this cut was from the shotgun recoil. Defendant gave three voluntary statements to the police at different times. In each statement defendant admitted shooting his wife, but said it happened when he tried to take the gun away from her. He insisted that it was an accident without premeditation and intent. His three statements differed as to whether he or his wife pulled the trigger.

Defendant testified at trial that, on the day of the shooting, he and his wife began drinking beer early in the afternoon. They drank approximately two 12–packs of beer. After supper they put the children to bed, then began drinking more. A few minutes after 9:00 p.m., defendant and his wife started arguing. His wife brought up accusations that he had sexually abused their three other children while living in Oklahoma. Defendant said that he usually kept the shotgun on the shelf in the living room or underneath the bed, but that he had brought it out earlier because he had seen his relatives driving around his house. He also had loaded the gun at that time. He said he had sawed off the barrel so that his wife could not sell the gun for beer money. While defendant and his wife were arguing, she got up and picked the gun off the shelf, saying she would kill him. Defendant got up off the couch, threw his beer on the floor, and tried to take the gun away from her. Defendant said that when his wife picked up the gun it was pointed towards him. Somehow, defendant testified, the gun was turned around and pointed towards his wife. Defendant said that his wife's left hand was on the barrel and her right finger was on the trigger. Defendant said that when the gun was turned around to face his wife, the barrel was about two feet from her chest. He also said she had somehow pulled back the hammer. Defendant told the jury that the gun

discharged accidentally when he and his wife were struggling over it. Defendant said his wife remained standing after the gun blast and said she was sorry.

Defendant said he tried to hide his wife's body after the shooting so that his children would not see it. He locked the children in their room and tried to clean up the house for the same reason. Defendant said his wife was killed at approximately 9:45 p.m., and that it took him 45 minutes to an hour to clean up before he went to John's Tavern to call the police. He said he put the gun underneath the mattress on the bed. Defendant stated that he thought for "maybe a minute" of getting rid of the body, but discarded the idea because he felt his wife deserved a better burial than that. Defendant said that he had a cut on his hand because his hand was covering his wife's hand when she accidentally pulled the trigger.

The state, at trial, called defendant's seven-year-old daughter, Karen Moore, who testified that on the night of her mother's death she was in bed and heard her mother and father arguing in the living room. She said that her parents had been drinking beer. She could not hear what they were saying, only that their voices were raised. At one point, however, she heard her father say "Debra, that's it, Debra, you are dead." Just after she heard these words, a gun exploded. A few minutes later she said that her father came into the room, hugged her sister Connie and told her he was sorry. Nine-year-old Connie Moore testified that after her father left, she peeked into the living room through a crack in the bedroom door and saw blood on the couch and on the floor.

Dr. Rottschafer, a pathologist, conducted an autopsy on Debra Moore. He discovered superficial bruises around Debra Moore's eye which occurred sometime close to the time of her death. There was a four inch by eight inch wound in her chest. Shotgun pellets and wadding were removed from the wound. There was no shotgun residue on her hands. Rottschafer testified that in his opinion the entry of the bullet was from left to right. The projec-

tile entered at a 45 degree angle through the middle of the upper side of her chest. Rottschafer testified that "Death would have been very, very instantaneous" because nearly every major organ in Debra Moore's body had been destroyed by the blast, but he admitted on cross-examination that it was possible that she could have lived for up to two minutes after the blast. Debra Moore had a blood alcohol content of 0.22% at the time of her death.

A firearms expert testified that the shotgun found at defendant's home was "consistent with" the shotgun which caused the death of Debra Moore. He testified that the shotgun used to kill Debra Moore had a normal trigger weight. The expert estimated that the distance of the muzzle from Debra Moore's chest when the gun discharged was from two to six feet. Defendant's blood was found on the barrel of the shotgun.

Gary L. Kaldun, a blood splatter interpretation expert, testified as to an analysis he conducted of the blood splatters in the Moore home. From the blood splatter pattern, Kaldun concluded that Debra Moore was either facing the dresser in the living room or at an angle to it and that her chest was approximately 24 inches from the floor at the time she was shot. In his opinion, Debra Moore was sitting or crouching on the floor at the time she was shot but could not have been standing. He did admit, however, that it was possible that she was on her way to sitting down on the floor at the time she was shot.

Defendant's attorney, seeking to respond to Kaldun's testimony in final argument, gave as his explanation of the shooting that defendant had become enraged when threatened by his wife, grabbed the gun away from her and pulled the trigger without intending to kill her. Defendant objected and asked for a new attorney, a request the court denied.

The trial court, without objection from counsel, gave the jury three packets of verdicts with instructions to return one verdict from each packet. The jury found defendant guilty of first degree premeditated murder, second degree unintentional murder and second degree culpable negligent manslaughter. He was sentenced to life imprisonment for the first degree murder conviction. This appeal followed.

■ 1. Defendant contends that he is entitled to a new trial because the jury returned legally inconsistent verdicts by finding him guilty of first degree premeditated murder and second degree culpable negligent manslaughter. Defendant was originally indicted for first degree premeditated murder, second degree intentional murder and second degree unintentional felony murder. At trial, in addition to the charges in the indictment, the jury was instructed on first and second degree manslaughter.

The court gave the jury three packets of verdict forms. The first packet contained guilty verdicts for first degree premeditated murder, second degree intentional murder, and first degree "heat-of-passion" manslaughter and a not guilty verdict. The second packet contained a guilty verdict for second degree unintentional murder and a not guilty verdict. The third packet contained a guilty verdict for second degree culpable negligent manslaughter and a not guilty verdict. The court instructed the jury to return one verdict from each packet. The jury, after beginning its deliberations, asked the judge to reread the definition of premeditation and five hours later returned with verdicts of guilty of premeditated murder, unintentional murder and second degree manslaughter.

Defendant argues that the requisite findings regarding the mental states for first degree murder and second degree manslaughter are legally inconsistent. We must determine whether these states of mind are inconsistent, then, if they are, whether defendant is entitled to a new trial. The trial court instructed the jury that in order to find defendant guilty of first degree murder they must find he acted with premeditation and intent to kill. Premeditation was defined as "considered, planned, prepared for or determined to commit the act before he committed it." "Intent" was defined as "act[ing] with the purpose of causing death or * * * hav[ing]

believed that his act would have that result." The jury was also instructed that they could find the defendant guilty of second degree manslaughter if they found that he caused the death of his wife by culpable negligence. Culpable negligence was defined as "negligently creating an unreasonable risk and consciously taking a chance of causing death or great bodily harm." *See also* 10 Minn. Dist. Judges Ass'n, *Minnesota Practice*, CRIMJIGS 11.-23–11.24 (West 1985 & Supp.1989).

This court has described the culpable negligence in the definition of second degree manslaughter as "recklessness," "intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." *State v. Zupetz*, 322 N.W.2d 730, 734 (Minn.1982) (quoting *State v. Beilke*, 267 Minn. 526, 534, 127 N.W.2d 516, 521 (1964)). In *State v. Frost*, 342 N.W.2d 317, 320 (Minn.1983), we said that the conduct described in the second degree manslaughter statute

> involves an element of awareness of the risk by the defendant. * * * [T]he statute requires proof of an objective element and a subjective element, the objective element being gross negligence and the subjective element being recklessness in the form of an actual conscious disregard of the risk created by the conduct.

*Id.*

In *State v. Zupetz*, where the defendant was convicted of attempted second degree manslaughter, we held that it is a logical impossibility to have an attempted second degree manslaughter because the intent involved in culpable negligence is not the same kind of intent involved in an attempt to commit a crime. An attempted crime is a specific intent crime which requires the specific intent to commit the particular offense. *Id.* at 734. It seemed to us then, and it seems to us now, "illogical that someone could intend to cause someone else's death through negligence or even recklessness." *Id.* at 735.

*Zupetz* is instructive on the question of whether the jury's verdicts in this case are legally inconsistent. First degree murder, like an attempted crime, is a specific intent crime. In order to be found guilty of first degree murder, the jury must specifically find that the defendant acted with premeditation and intended to cause the death of the victim. To the extent that, as *Zupetz* holds, one cannot attempt to commit negligent or reckless acts, so one cannot premeditate and intend to be culpably negligent in causing the death of another. We are unable to reconcile the jury's findings that defendant caused the death of his wife with premeditation and intent and at the same time caused that death through negligence or reckless conduct. These verdicts are as incompatible as were the verdicts of intentional murder and reckless manslaughter in *People v. Gallagher*, 69 N.Y.2d 525, 516 N.Y.S.2d 174, 508 N.E.2d 909 (1987). There, the New York Court of Appeals stated:

> Because the jury found defendant guilty of both * * * it is impossible to determine what if anything the jury decided on the issue of defendant's mental state at the time of the offense. * * * It is not for the Appellate Division * * * to determine whether defendant acted intentionally or recklessly at the time of the crime. That is the jury's function. Because the jury here failed to make the critical determination of defendant's mental state, an omission that cannot be cured by the Appellate Division's exercise of interest of justice jurisdiction, the error has not been rendered academic.

*Id.* at 530, 516 N.Y.S.2d at 175–76, 508 N.E.2d at 910–11. *See also People v. Hoffer*, 106 Ill.2d 186, 88 Ill.Dec. 20, 478 N.E.2d 335 (1985), *cert. denied*, 474 U.S. 847, 106 S.Ct. 139, 88 L.Ed.2d 114 (1985) (defendant was entitled to a new trial after a jury found him guilty of murder, voluntary manslaughter and involuntary manslaughter). Here, as well, the error is not academic. We hold the jury returned legally inconsistent verdicts in finding defendant guilty of first degree premeditated murder and second degree manslaughter.

Defendant has requested a new trial or a reduced conviction for second degree manslaughter. We might be inclined to reduce the conviction to second degree manslaughter pursuant to Minn.Stat. § 611.02 (1988),[5] but in view of the fact that defendant's counsel's admission of guilt in closing argument may have precluded a fair trial on the second degree manslaughter charge, a new trial appears to be a more appropriate remedy.

■ 2. The necessity for a new trial becomes clear when we consider defendant's argument that he was denied a fair trial and effective assistance of counsel when his trial counsel conceded his guilt in closing argument without his consent. Defendant maintained throughout the proceedings and testified at trial that the death of his wife was an accident. In closing argument defendant's counsel followed through on the defendant's testimony that the shooting was an accident. After finishing with this line of the argument, however, counsel then attempted to explain the state's evidence about the position of Debra Moore's body at the time she was killed. He stated:

Well, really, Ladies and Gentlemen, I think this is what happened, and the only logical way to put all this together, after all the facts add up is this kind of an explanation.

First of all there was, as Mr. Moore indicated, an argument. His wife picked up the gun, he got it away from her, he was enraged at this point, he was half in the bag, shall we say, he had a fair amount to drink and because of that his reason was obscured, he got it away from her, I can just hear what is going on, I can just hear yelling.

\* \* \* \* \* \*

I think, as I say, what the only logical explanation, considering that the position of the body when it was, when it was shot, was very close to the dresser \* \* \* and that Mr. Moore was standing \* \* \* that she had grabbed the gun, had point-

ed it at him, he in a rage threw his beer down, came up, grabbed the gun, got it away from her and yelling, I am sure the yelling continued and he pulled the trigger without intending to kill her, without intending to commit any act or form of assault.

We have got heat-of-passion here, that kind of conduct, that kind of activity, coupled with the intoxication would arouse anybody to do anything like that.

She seeing what is happening tries to avoid the shot, she starts on her way down, she decides to crouch down and on her way down ——

After defendant's counsel made this statement, defendant stood up at counsel table, and in front of the jury said "I object, Your Honor. This attorney is lying against me. What I said on the stand yesterday when he questioned \* \* \* I am asking for a different attorney and change of venue right now." Defendant explained how his testimony was the truth. The trial judge denied defendant's motion and, after a recess, defendant's counsel told the jury that his client wanted him to tell them that defendant was telling the truth.

In *State v. Wiplinger*, 343 N.W.2d 858 (Minn.1984), we held that an unauthorized implied admission of guilt by a defendant's trial counsel, without a defendant's permission or acquiescence, will result in a new trial. *Id.* at 861. In *Wiplinger*, defendant's counsel asked the victim and her grandmother questions concerning whether the defendant acted violently towards her. These questions impliedly admitted that the defendant was the perpetrator of the crime. This line of questioning—subtle though it was—amounted to an admission of defendant's guilt of the crime charged. We held that under the particular circumstances of that case, the implied admission of guilt was not amenable to a harmless error analysis and defendant was entitled to a new trial.

There are some differences between the instant case and *Wiplinger*. Here, defen-

---

**5.** Minn.Stat. § 611.02 (1988) provides "when an offense has been proved against the defendant, and there exists a reasonable doubt as to which

of two or more degrees the defendant is guilty, the defendant shall be convicted only of the lowest."

dant's counsel did not impliedly admit defendant's guilt, rather, he told the jury "what really happened," in light of the state's evidence, was a heat-of-passion manslaughter. Counsel's actions in the instant case are similar to counsel's actions in *Wiley v. Sowders*, 647 F.2d 642 (6th Cir.1981), *cert. denied*, 454 U.S. 1091, 102 S.Ct. 656, 70 L.Ed.2d 630 (1981). In *Wiley*, defendant's counsel specifically admitted that the defendant was guilty, but asked the jury for compassion. In the instant case, the motivation for counsel's argument cannot be condemned. The state's evidence about the position of Debra Moore effectively destroyed defendant's story of an accident. Defendant's counsel was attempting to concede defendant's guilt of the lesser-included offense of manslaughter "in the hope of persuading the jury to acquit defendant of the greater charged offense." *Wiplinger*, 343 N.W.2d at 861. This strategy was recognized in *Wiplinger* as a valid reason to concede guilt. However, as we also noted in *Wiplinger*, "whether or not to admit guilt at a trial is a decision that under our system can only be made by the defendant." *Id.* at 861. Defendant in the instant case made clear by his immediate objection that he did not consent or acquiesce to this strategy. We hold that defendant was denied a fair trial and effective assistance of counsel entitling him to a new trial when his attorney conceded, without defendant's permission, that defendant was guilty of heat-of-passion manslaughter. A new trial is required on this ground, even though it might not have been necessary on the inconsistent verdicts alone.

3. Finally, we consider the admissibility of Gary Kaldun's analysis of the blood splatters in the Moore living room. Defendant argues that the trial court committed reversible error by admitting the evidence because the state failed to qualify Kaldun as an expert, failed to establish that results of blood splatter analysis are generally accepted in the scientific community, and failed to demonstrate that the results of the analysis in this case were reliable. Kaldun's analysis of the blood splatter in the Moores' living room allowed him to testify at trial to the position of Debra Moore's body at the time she was shot. This evidence was important to the jury's finding of first degree murder because it made defendant's version of what happened highly unlikely, if not impossible.

■ As to Kaldun's qualifications as an expert witness, the sufficiency of an expert's qualifications, like proper foundation, rests within the sound discretion of the trial court. *State v. Sandberg*, 406 N.W.2d 506, 511 (1987). Minn.R.Evid. 702 provides that an expert may be qualified "by knowledge, skill, experience, training, or education." Kaldun served as an expert for two different areas of the trial. First, he testified as to the blood types found in the Moore home, then as to the blood splatters in the Moore living room. Kaldun is a serologist with a bachelor's degree in biology and medical technology, had worked at a hospital for six years before joining the BCA in 1980, and is currently the BCA crime scene coordinator. He has had two additional years of training in serology and has attended FBI training for serology, as well as other classes throughout the country. Kaldun had performed 30 to 35 blood splatter interpretations before this case.

Kaldun testified to his general qualifications, but because he did not give any testimony concerning his training in the specific area of blood splatter interpretation, defendant contends that admission of the blood splatter interpretation was an error. The state argues that because Kaldun is a trained serologist who has performed many splatter test interpretations in the past, he is qualified to testify by virtue of his experience in the field.

This court has taken a liberal approach to the question of an expert's qualifications by virtue of experience. *See Sandberg*, 406 N.W.2d at 511 (experience with sexual abuse qualified police officer as expert); *State v. Tienter*, 338 N.W.2d 43, 44 (Minn. 1983) (deputy sheriff's experience in estimating damages qualified him as an expert); *State v. Arndt*, 285 N.W.2d 478, 481 (Minn.1979) (experience with users of hypodermic needles qualified police officer as expert). Since Kaldun is a trained blood

specialist with over 16 years experience, the last 10 with the BCA, and since he has performed between 30–35 blood splatter interpretations, there was sufficient foundation for the trial court to conclude that by virtue of his training Kaldun was an expert in the area of blood splatter analysis. *See People v. Knox*, 121 Ill.App.3d 579, 584, 76 Ill.Dec. 942, 946, 459 N.E.2d 1077, 1081 (1984) (experience as police officer and crime scene investigator, reading on the subject of bloodstain interpretation and relative simplicity of the procedure, qualified witness as an expert).

■ This court has not had occasion to address the specific issue of whether blood splatter interpretation is a generally accepted scientific technique within the scientific community. We have, though, on at least five occasions, cited the results of blood splatter interpretations in murder and manslaughter cases. *See State v. Merrill*, 428 N.W.2d 361, 370 (Minn.1988); *State v. Norris*, 428 N.W.2d 61, 68 (Minn. 1988); *State v. Robinson*, 427 N.W.2d 217, 226 (Minn.1988); *State v. Gibbons*, 305 N.W.2d 331, 334 (Minn.1981) and *State v. Malzac*, 309 Minn. 300, 306, 244 N.W.2d 258, 262 (1976). In these five opinions we "implicitly accept[ed] the reliability" of blood splatter interpretation insofar as the opinions cited the results of the blood splatter analysis as support for or against a murder or manslaughter conviction. *State v. Fenney*, 448 N.W.2d 54, 58 n. 1 (Minn. 1989).

The proponent of a scientific test has the burden of demonstrating its reliability. At trial, Kaldun gave the following explanation of the blood splatter interpretation technique:

During bloodsplattering interpretation we look at the actual droplets of blood that have been shed on a crime scene.

Blood has characteristics that abide by the law of physics when blood is shed, whether it is from a stabbing, bludgeon or gunshot wound.

When a drop of blood is shed it undergoes certain patterns. If it is dropped straight up and down and lands on a surface, it will leave a perfectly round pattern.

As the angle increases the blood splatter or droplets of blood as they strike something will become longer or narrower.

There is a mathematical correlation between the length and the width of these blood splatters that can be measured. We can then determine what angle they came in at and by using a set of strings and thumbtacks and large protractor we are able to reconstruct the scenes of crimes many times and actually place people where they were at the time they were injured * * * or shot.

In addition to this explanation, Kaldun testified that blood splatter interpretation was a generally accepted technique within the scientific community.

Defendant did not request a *Frye/Mack* hearing on the general admissibility of blood splatter interpretation, nor did he call his own expert witnesses to refute the state's expert testimony that blood splatter interpretation is reliable and generally accepted in the scientific community. Other jurisdictions have not required a substantial foundation to be laid to establish the overall general acceptance of blood splatter interpretation.[6] The reasoning is primarily

---

**6.** Courts have held blood splatter interpretation to be reliable and accepted in the scientific community by recognizing the simplicity and reliability of the scientific principles underlying blood splatter interpretation. Once testimony is introduced concerning the basic principles of blood splatter analysis, and the reliability of the underlying principles is recognized, blood splatter interpretation itself is deemed to be generally accepted and reliable. *See, e.g., People v. Knox*, 121 Ill.App.3d 579, 583–84, 76 Ill.Dec. 942, 945–46, 459 N.E.2d 1077, 1080–81 (1984); *Lewis v. State*, 737 S.W.2d 857, 861 (Tex.Ct.App.1987) (reliability and acceptance proven because based on widely recognized general principles). Similarly, some courts have reached the same conclusion by taking judicial notice of the general reliability of the principles underlying blood splatter interpretation. Because the techniques involved in the analysis are based on the well-settled sciences of chemistry and physics, the reliability of the technique may be appropriate for judicial notice. *See Knox*, 121 Ill.App.3d at 583, 76 Ill.Dec. at 945, 459 N.E.2d at 1080 (court recognizes that judicial notice may be taken of reliability of splattering characteristics of human blood). This approach has been fol-

based on the fact that the analysis of blood splatters at a crime scene is not an emerging scientific area like DNA testing or electrophoretic typing. *E.g., State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980), *cert. denied,* 450 U.S. 927, 101 S.Ct. 1384, 67 L.Ed.2d 359 (1981). Blood splatter analysis is a simple way for crime scene investigators to determine the position of a victim's body by the placement and formation of the blood splatters at the time the wound was inflicted. It is a narrow application of techniques borrowed from established fields. *Lewis v. State,* 737 S.W.2d 857, 861 (Tex.Ct.App. 1987). The state sufficiently established that the results of blood splatter analysis are generally accepted in the scientific as well as the judicial community.

■ Nevertheless, the state is still required to demonstrate the reliability of a particular test in a given case. *People v. Owens,* 155 Ill.App.3d 990, 998–99, 108 Ill. Dec. 511, 517, 508 N.E.2d 1088, 1094 (1987); *Knox,* 121 Ill.App.3d at 583, 76 Ill.Dec. at 945–946, 459 N.E.2d at 1080–1081. Of most concern in this case is not the general acceptance of blood splatter interpretation in the scientific community, but the foundation introduced by the state regarding the reliability of this particular interpretation. A proper foundation for a scientific test requires the "proponent of a * * * test [to] establish that the test itself is reliable and that its administration in the particular instance conformed to the procedure necessary to ensure reliability." *State v. Dille,* 258 N.W.2d 565, 567 (Minn.1977). "The question of proper foundation is largely one for the discretion of the trial court * * *." *State v. Bott,* 310 Minn. 331, 334, 246 N.W.2d 48, 51 (1976).

At trial, Kaldun testified that he used approximately 20 blood splatters in the Moore living room to calculate the point of convergence for the gunshot wound. Kaldun testified that the tools needed for the interpretation were string, thumbtacks, masking tape and anchors to which the string was tied. The state introduced pictures showing Kaldun performing the tests. On the basis of his analysis of the 20 blood splatters in the Moores' living room, he was able to form an opinion concerning the position of Debra Moore's chest at the time she was shot.

The determination of a proper foundation rests within the sound discretion of the trial court (on the evidence presented) including Kaldun's testimony about the general theory behind blood splatter interpretation and his application of the theory when he conducted the tests, the trial court did not abuse its discretion in concluding there was sufficient evidence that the blood splatter analysis in this case was reliable. Therefore, we hold the trial court did not err in admitting evidence based on the blood splatter analysis.

We reverse the judgment of conviction and remand for a new trial.

Reversed and remanded for a new trial.

lowed in this state for the principles underlying radar. *State v. Gerdes,* 291 Minn. 353, 359, 191 N.W.2d 428, 432 (1971) ("courts may take judicial notice of the reliability of the underlying principles of radar [Doppler effect] as a means of determining the speed of moving objects").

General acceptance and reliability have also been proven by such things as: the existence of training programs for blood splatter interpretation; the existence of organizations for the same; the offering of courses and seminars on the subject and the availability of specialized journals on bloodstain interpretation. *See State v. Hall,* 297 N.W.2d 80, 85 (Iowa 1980). In the absence of specific proof at trial that the analysis was reliable and generally accepted by the scientific community, other courts have relied, at least in part, on the general acceptance of blood splatter analysis in the United States at large. *Lewis,* 737 S.W.2d at 860 ("judicial recognition is a factor in determining general acceptance").