STATE of Minnesota, Respondent,

v.

Peggy Ann BARSNESS, Appellant.

No. C6–90–1882.

Court of Appeals of Minnesota.

July 9, 1991.

Review Denied Aug. 29, 1991.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, James C. Backstrom, Dakota County Atty., Phillip D. Prokopowicz, Asst. County Atty., Hastings, for respondent.

John M. Stuart, State Public Defender, Scott G. Swanson, Asst. Public Defender, Minneapolis, for appellant.

Considered and decided by SHORT, P.J., and FORSBERG and SCHUMACHER, JJ.

## OPINION

FORSBERG, Judge.

This appeal is from judgments of conviction and sentences for second degree intentional murder, Minn.Stat. § 609.19(1) (1990) and second degree manslaughter, Minn. Stat. § 609.205(1) (1990). We affirm.

## FACTS

Appellant Peggy Barsness was indicted on counts of second degree intentional murder and second degree culpable negligence manslaughter in the death of her six-month-old daughter Kirsten. Barsness left Kirsten unattended on January 23, 1989, when she flew to San Francisco to visit her boyfriend, Timothy Brewer.

Barsness flew back to Minneapolis a week later and found Kirsten dead in her apartment. She initially told police she had left the infant with a baby sitter. Barsness remained at the police station throughout the day of January 30 as police attempted to locate the baby sitter. In the evening, she gave a statement to police admitting she had left Kirsten alone in her apartment. She told police she convinced herself someone would discover the baby, but also admitted she left the infant unattended, "with the full realization that that would result in her death."

Barsness did not claim mental illness as a defense. She did seek to introduce evidence of post-partum depression and her intelligence level as bearing on the issue of intent. The state appealed a pretrial ruling that IQ evidence could be introduced to a limited extent. *See State v. Barsness*, 446 N.W.2d 666, 667 (Minn.App.1989), *rev'd by order* (Minn.1990).

At trial, the court allowed Barsness to present expert testimony as to her IQ score, but did not allow testimony tying Barsness' IQ to her capacity to form the intent required for intentional murder. The court allowed testimony about the symptoms of depression generally and the medical diagnosis of post-partum depression, but excluded expert opinion testimony that Barsness was afflicted with post-partum depression. The court disallowed any expert testimony explaining to the jury an anxiety attack Barsness experienced in the middle of trial. This attack precipitated a lengthy recess and a hearing on Barsness' competency to proceed.

The state presented evidence that early in the morning of January 23 Barsness made a one-way ticket reservation for a 2:35 p.m. flight to San Francisco. Barsness stopped at her mother's house at about 11 a.m. and asked her to baby-sit. Her mother told Barsness she had other plans and could not watch Kirsten. Bars-

ness then called a friend, who referred her to a woman who was available to baby-sit. After getting directions Barsness drove to the apartment complex where the woman was staying, but was unable to locate the apartment. She then drove home, fed Kirsten and rocked her to sleep, placed her in her crib and drove to the airport.

At the airport, Barsness called her parents' house, but when her brother answered the phone, she hung up. Barsness and Brewer went to bars and drank during most of Brewer's off-duty hours the week of January 23 to 30. Barsness told police she made several "hang up" calls to her parents during the week.

On Thursday, January 26, Barsness called a friend and asked him to check on her apartment, but he was unable to do so. Several people did stop by the apartment, and one entered through an unlocked patio door but did not discover the baby. On Sunday, Brewer confronted Barsness, accusing her of lying to him about where the baby was. Barsness told him that she would go to jail if she returned, that she had left Kirsten in her crib, and that the baby would be dead when she got back.

In discussing the final instructions to the jury, Barsness objected to language that intent to kill could be found if she "believed that [her] act would have that result." The trial court, however, gave this instruction. The trial court also instructed the jury that Barsness' IQ was not relevant to the element of intent.

The state argued Barsness' abandonment of Kirsten on January 23 was an intentional act, and that when Barsness left Kirsten unattended, she believed the act would cause the baby's death. The jury returned verdicts of guilty of both second degree intentional murder and second degree culpable negligence manslaughter.

Before sentencing, Barsness moved to vacate the second degree murder conviction as legally inconsistent with the manslaughter conviction. The trial court denied this motion, and adjudicated and sentenced Barsness on both convictions. The court sentenced her to 180 months for second degree murder, a downward departure of 36 months from the presumptive 216-month sentence. The court cited Barsness' lack of substantial capacity for judgment because of her mental impairment and the fact she was suffering from major depression at the time of the offense as factors relevant to the departure.

## ISSUES

1. Are the jury's verdicts of guilty of intentional murder and culpable negligence manslaughter legally inconsistent?

2. Did the trial court abuse its discretion in admitting a photograph and videotape of the victim?

3. Did the court abuse its discretion in excluding evidence of mental impairment?

4. Did the court abuse its discretion in failing to further mitigate Barsness' sentence?

## ANALYSIS

### 1. Consistency of verdicts

After trial in this case, but before sentencing, the supreme court issued its opinion in *State v. Moore*, 458 N.W.2d 90 (Minn. 1990), holding that verdicts of guilty of first degree premeditated murder and of second degree culpable negligence manslaughter are legally inconsistent. The court stated:

> We are unable to reconcile the jury's findings that defendant caused the death of his wife with premeditation and intent and at the same time caused that death through negligence or reckless conduct.

*Id.* at 94. Barsness argues that the rationale of *Moore* extends to the guilty verdicts returned in this case. We disagree.

Second degree murder is committed by one who

> [c]auses the death of a human being with intent to effect the death of that person or another, but without premeditation.

Minn.Stat. § 609.19(1) (1990). Second degree culpable negligence manslaughter is committed by one who

> causes the death of another * * *

(1) by the person's culpable negligence whereby the person creates an unreasonable risk, and consciously takes chances of causing death or great bodily harm to another.

Minn.Stat. § 609.205(1) (1990).

Barsness contends the mental state of intending to cause death is inconsistent with the mental state of consciously taking a chance of causing death. However, the statutory definition of intent is broader than this argument implies. The general definitions of mental state in the criminal code include the following:

"With intent to" * * * means that the actor either has a purpose to do the thing or cause the result specified *or believes that the act, if successful, will cause that result.*

Minn.Stat. § 609.02, subd. 9(4) (1990) (emphasis added).

The state in this case argued to the jury that Barsness believed her abandonment would cause Kirsten's death, not that she had formed a purpose to cause the death. This broader definition of intent was given in the instructions to the jury. *See* 10 Minnesota Practice CRIM. JIG 11.13 (1990). The state argues such a mental state is not inconsistent with culpable negligence. We agree.

The supreme court stated in *Moore:*

First degree murder, like an attempted crime, is a specific intent crime. In order to be found guilty of first degree murder, the jury must specifically find that the defendant acted with premeditation and intended to cause the death of the victim. To the extent that, as [*State v.*] *Zupetz* [322 N.W.2d 730 (Minn.1982)] holds, one cannot attempt to commit negligent or reckless acts, so one cannot premeditate and intend to be culpably negligent in causing the death of another.

*Id.*, 458 N.W.2d at 94. The holding of *Moore* reflects the considerable difference between first degree premeditated murder and second degree intentional murder. As *Moore* indicates, premeditated murder requires a conscious objective to bring about the result (death). It does not require sim-

ply that the defendant committed an act which he believed would have that result.

■ Intentional murder may be committed if the defendant believed his act would result in death. Minn.Stat. §§ 609.19(1), 609.02, subd. 9(4). Because the mental state of "belief" or "knowledge" of the consequences does not require purpose or design, it does not conflict with the notion of recklessness. The element of recklessness involved in culpable negligence manslaughter requires "an actual conscious disregard of the risk created by the conduct." *State v. Frost,* 342 N.W.2d 317, 320 (Minn. 1983). The risk created by culpably negligent conduct remains a "risk," not a certainty, of causing death, just as a "belief" that death will result falls short of absolute certainty. *Cf.* Model Penal Code § 2.02(2)(b)(ii) (1962) (person acts "knowingly" if aware that a result is "practically certain" to flow from his conduct). The two elements are not inconsistent, and the jury's verdicts are not legally inconsistent.

*2. Admission of photograph and videotape*

■ Photographs of a graphic or disturbing nature are not rendered inadmissible because they incidentally may tend to arouse the passion or prejudice of the jury. *State v. Durfee,* 322 N.W.2d 778, 785–86 (Minn.1982); *see also State v. Borden,* 455 N.W.2d 482, 484 (Minn.App.1990) (videotape of actual crime), *pet. for rev. denied* (Minn. Jul. 13, 1990). Although Barsness offered to stipulate to the cause of death, the state was not required to accept such a stipulation. *See Durfee,* 322 N.W.2d at 785 (party may not automatically preclude his adversary's proof by an offer to stipulate). The photograph and videotape were relevant to this issue, particularly because another person had entered the apartment before the child's death. The trial court did not abuse its discretion in admitting the photograph and videotape.

*3. Exclusion of evidence of mental impairment*

■ Barsness contends the trial court abused its discretion in excluding some evi-

dence of low IQ and mental illness, and in instructing the jury that evidence on those issues was not relevant to intent. This court had previously held in a pretrial appeal that IQ evidence was not admissible to show lack of intent or diminished capacity. *State v. Barsness*, 446 N.W.2d at 668. This decision was reversed only on the basis that the state had not met the critical impact prong of the *Webber* test.

In *State v. Bouwman*, 328 N.W.2d 703, 706 (Minn.1982), the supreme court, rejecting the doctrine of diminished responsibility, held that psychiatric evidence on the defendant's mental capacity is inadmissible on the issue of intent. Since the pretrial appeal, the supreme court has reaffirmed *Bouwman* while noting that the "behavioral manifestations of mental impairment"— as opposed to psychiatric labeling of it—is "capable of lay understanding." *State v. Brom*, 463 N.W.2d 758, 763 n. 9 (Minn. 1990), *cert. denied*, — U.S. —, 111 S.Ct. 1398, 113 L.Ed.2d 453 (1991). Barsness sought to introduce expert testimony on intelligence levels and post-partum depression. She was allowed to introduce evidence of behavioral manifestations of these conditions, as well as some expert testimony.

This court noted in the opinion on the pretrial appeal that it is for the supreme court or the legislature to alter or create exceptions to *Bouwman*. *Barsness*, 446 N.W.2d at 668. Moreover, the trial record reveals that defense counsel had ample opportunity to suggest to the jury that it should consider Barsness' mental condition in deciding what mental state she possessed. The trial court did not abuse its discretion in its evidentiary rulings and jury instructions on this issue.

### 4. Sentencing departure

The trial court, following a lengthy evidentiary hearing on Barsness' motion for a sentencing departure, imposed a 180–month sentence for second degree murder, a 36–month downward departure. The court cited evidence that Barsness was: 1) borderline mentally retarded; 2) chemically dependent; and 3) suffering from major,

severe depression. Barsness argues on appeal that this limited departure did not adequately reflect the mitigating factors.

We conclude the court's departure adequately reflects Barsness' "[lack of] substantial capacity for judgment when the offense was committed." *See* Minn. Sent. Guidelines II.D.2.a.(3). The trial court has broad discretion to depart where aggravating or mitigating factors are present. *State v. Best*, 449 N.W.2d 426, 427 (Minn. 1989). The trial court determined that mitigating factors do exist. The degree to which Barsness lacked substantial capacity for judgment is the type of factual issue best decided by the trial court. *Cf. State v. Campbell*, 367 N.W.2d 454, 461 (Minn.1985) (issue whether defendant played a passive role). Here the vulnerability of the six-month-old child countered much of the mitigating effect of the factors cited. The trial court did not abuse its discretion in the departure ordered.

### DECISION

The jury's verdicts are not legally inconsistent. The trial court did not abuse its discretion in its evidentiary rulings or in instructing the jury. The trial court did not abuse its discretion in sentencing.

Affirmed.