STATE of Minnesota, Respondent,

v.

Tony Allen ROMAN NOSE, Appellant.

No. CX–01–1560.

Supreme Court of Minnesota.

Aug. 21, 2003.

John M. Stuart, State Public Defender, Steven P. Russett, # 161263, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota Attorney General, St. Paul, MN, Doug Johnson, Washington County Attorney, John W. Fristik, # 32335, Assistant County Attorney, Stillwater, MN, for Respondent.

## OPINION

ANDERSON, RUSSELL A., Justice.

Appellant Tony Allen Roman Nose was convicted in Washington County of first-degree murder while committing or attempting to commit criminal sexual conduct and sentenced to life in prison without the possibility of parole for the death of Jolene Stuedemann. Upon review, we stayed the appeal, retained jurisdiction, and remanded the case to the district court for a hearing on whether the PCR–STR method of testing DNA has gained general acceptance within the relevant scientific community. *State v. Roman Nose,* 649 N.W.2d 815, 823 (Minn.2002).

On remand, the district court issued its findings of fact and concluded in its order that PCR–STR testing is generally accepted in the relevant scientific community as reliable. In Roman Nose's appeal, now before this court, he concedes the general acceptance issue given our recent holding in *State v. Traylor,* 656 N.W.2d 885 (Minn. 2003). We address the remaining issues raised by Roman Nose in his initial appeal as well as additional arguments presented following remand. Specifically, in his initial appeal, Roman Nose asserted that the district court erred when it admitted: (1) DNA evidence; (2) random match probability statistics; (3) testimony that Roman Nose could have conducted his own DNA testing; and (4) a picture found on Roman Nose's bedroom wall. Roman Nose further argued that the prosecutor committed misconduct by misstating testimony and by misleading the jury about inferences that could be drawn from the evidence. Roman Nose now also asserts that the DNA evidence, even if admissible, was presented in a misleading and prejudicial manner. We affirm.

The body of 17–year–old Jolene Stuedemann was found in her home on July 11,

2000. The autopsy revealed that she had been beaten, stabbed multiple times with a screwdriver, and sexually assaulted. That same evening, Roman Nose took his Walkman and left his group home residence without permission. He went to the home of Andy Reiman, the boyfriend of Stuedemann. There, Roman Nose, Reiman, and Stuedemann drank beer and watched television. Roman Nose also claimed that Stuedemann gave him some marijuana and that he and Stuedemann did some "coke."

Roman Nose testified that he was sitting on the couch listening to music with his eyes shut and that when he opened his eyes, he saw Reiman and Stuedemann engaging in sexual intercourse. According to Roman Nose, he and Stuedemann then had sex while Reiman slept. Reiman testified, however, that he did not fall asleep immediately after he and Stuedemann had sex and that he was certain that Stuedemann did not have sex with Roman Nose.

Stuedemann left around 3:30 a.m. while Roman Nose was sleeping. Reiman then woke Roman Nose and he left around 4 a.m. Roman Nose eventually returned to the group home. Because he had been reported as a runaway the night before, the house parent notified police of Roman Nose's return to the group home and a police officer interviewed Roman Nose. Roman Nose told the officer that he had been with Reiman the night before.

After talking with Roman Nose, the officer responded to a call that resulted in the discovery of Stuedemann's body. At the scene, investigators discovered part of a set of headphones under Stuedemann's body and a blood-stained screwdriver near the body. They also found a piece of crumpled newspaper in Stuedemann's

mouth and a bathroom towel with blood on it. Dolores Schoenbauer, a forensic scientist at the Minnesota Bureau of Criminal Apprehension (BCA), performed DNA testing on the blood found on the newspaper, screwdriver, and bathroom towel. Schoenbauer testified that the blood matched Stuedemann's DNA profile and that the probability of a match on the blood on the newspaper and screwdriver was 1 in 63 trillion.[1] Fingerprint analysis was also performed on the newspaper and a latent fingerprint was found that matched Roman Nose's left middle finger.

Subsequently, the house parent learned of blood-stained clothing belonging to Roman Nose that had been placed in a trash bag in the garage of the group home, and she notified the police. Authorities found the lower half of a set of headphones in the group home's kitchen garbage and a Walkman with no headphones attached in Roman Nose's bedroom. The police also found a pair of boxer shorts in Roman Nose's bedroom that were stained with a mixture of blood and semen and a picture on the wall that depicted a suspended human form with arms extended and stars trailing from the hands.

Forensic testing on the headphone indicated that the headphones found in the garbage and the part of the headphones found under Stuedemann's body could have been a match. DNA testing was performed by the BCA on the blood on the jeans and jersey found in the garage and on the blood/semen mixture on the boxer shorts found in Roman Nose's bedroom. The BCA's Schoenbauer testified that the blood found on Roman Nose's jeans and jersey matched Stuedemann's DNA profile, with the probability of such a match 1

---

[1]. Schoenbauer testified that she was able to get only a partial DNA profile from the blood on the bathroom towel but was still able to conclude that the partial DNA profile matched Stuedemann's. Schoenbauer further stated that the "DNA partial profile [on the bathroom towel] only occurs in about 7.1 percent of the population."

in 63 trillion. When analyzing the jeans, Schoenbauer also found semen on the zipper area. DNA testing by Schoenbauer revealed that the semen contained a mixture of DNA, with the predominant DNA profile matching Roman Nose's DNA profile. Schoenbauer testified that the probability of a match of the predominant DNA profile was 1 in 63 trillion. As to the blood/semen mixture found on Roman Nose's boxer shorts, Schoenbauer first performed a differential extraction to separate the sperm cell from the nonsperm cell and then analyzed the respective parts. She determined that the sperm portion of the mixture matched Roman Nose's DNA profile with the probability of a match 1 in 63 trillion and that the nonsperm portion was consistent with coming from both Roman Nose and Stuedemann.

As part of the investigation, a perineal swab and vaginal swabs were also taken from Stuedemann's body and tested for semen, which was found on both swab types. Schoenbauer testified that DNA testing on the perineal swab indicated that Roman Nose was the source of the semen with a probability of a match 1 in 63 trillion. Schoenbauer further testified that the vaginal swabs contained a mixture of DNA with the predominant DNA profile matching Roman Nose's DNA profile and the probability of such a match was 1 in 63 trillion. Schoenbauer also identified weaker DNA profiles on the vaginal swabs and testified that she could not eliminate either Reiman or Stuedemann as possible sources of the weaker DNA profiles.

Roman Nose testified at trial and offered his version of events that transpired that night. According to Roman Nose, after he left Reiman's home he began walking back to the group home and realized he did not have his Walkman. He attempted to sneak into the group home, but when that attempt failed, he went to Stuedemann's home. He found the lights on, but nobody answered the door. Fearing that Stuedemann had overdosed, he entered the home through the back door and discovered her body. Roman Nose testified that he ran inside, knelt on one knee beside the body, saw some paper stuffed in her mouth, and tried to pull it out but could not. He then saw his Walkman next to Stuedemann's body. Roman Nose testified that he did not call police because he was scared because he had used drugs and had sex with Stuedemann, had her blood on his clothing, and his Walkman was next to her body. Roman Nose testified that he then vomited in the toilet, took his Walkman, and ran to the group home. He changed his clothes and slept in a van in front of the group home. Roman Nose told a house parent that he had changed clothes because he had spilled beer on them.

Roman Nose was found guilty by a Washington County jury of murder in the first degree while committing or attempting to commit criminal sexual conduct and premeditated murder in the first degree. The district court entered judgment of conviction on the charge of murder in the first degree while committing or attempting to commit criminal sexual conduct in the first or second degree under Minn. Stat. § 609.185(2) (2000) and sentenced Roman Nose to life in prison without the possibility of parole.

Roman Nose appealed to this court, asserting that the district court erred when it admitted DNA evidence without conducting a hearing on the first prong of the *Frye–Mack* standard, the general acceptance of the PCR–STR [2] method of testing

**2.** PCR stands for "polymerase chain reaction" technique. There are various methods of the PCR technique of DNA testing. STR is the newest PCR technology and stands for

DNA currently being used by the BCA. Roman Nose further argued that the court erred when it concluded under prong two of the *Frye–Mack* standard that the BCA's method of DNA testing produced evidence that was foundationally reliable and accurate and allowed the admission of the DNA evidence. In addition to the allegedly erroneous admission of the DNA evidence, Roman Nose also challenged the court's admission of random match probability statistics, of testimony that it was BCA policy to save a portion of the physical evidence for the defendant to conduct his own DNA testing, and of a picture found on the wall of Roman Nose's bedroom. Lastly, Roman Nose asserted that the prosecutor committed prosecutorial misconduct when he misstated testimony and misled the jury about inferences that could be drawn from the evidence. Because of these errors by the district court and the prosecution, Roman Nose asserted that he was denied his right to a fair trial and consequently, should be awarded a new trial.

Upon review, we stayed the appeal, retained jurisdiction, and remanded the case to the district court for "a hearing on whether the PCR–STR method of testing DNA has gained general acceptance within the relevant scientific community." *Roman Nose*, 649 N.W.2d at 823. Upon remand, the district court held a *Frye–Mack* hearing as instructed and heard testimony from 13 witnesses. Additionally, the court heard testimony and received documentary evidence related to statistics and population databases although it recognized that the evidence may be beyond the scope of the remand.

Subsequent to the hearing, the district court issued its findings of fact and concluded in its order that PCR–STR testing is generally accepted in the relevant scientific community as reliable. In addition, the court issued supplemental findings and conclusions on the presentation of DNA probability statistics based on the additional evidence presented during the hearing. Upon Roman Nose's motion, this court vacated the stay and reinstated Roman Nose's appeal.

Roman Nose now concedes the general acceptance issue given our recent holding in *State v. Traylor*. 656 N.W.2d at 893. However, he continues to argue that his conviction should be overturned and he be granted a new trial based on the other issues originally raised, but not resolved, in his initial appeal to this court. In addition, based on the additional information presented in the *Frye–Mack* hearing on remand, Roman Nose now contends that the DNA evidence was presented to the jury in a misleading and prejudicial manner.

I.

■ We begin by examining Roman Nose's challenge to the district court's evidentiary rulings regarding the admissibility of evidence. Rulings on evidentiary matters rest within the sound discretion of the trial court, and we will not reverse such evidentiary rulings absent a clear abuse of discretion. *State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003).

*Admissibility of DNA Evidence*

Roman Nose asserts that the district court erred in concluding that the DNA testing performed by the BCA was reliable under prong two of the *Frye–Mack* standard and thereby allowing the admission of

---

"short tandem repeat" technology. The PCR–STR method of testing DNA has been used by the BCA since February 1999.

the DNA evidence. A review of Roman Nose's arguments indicates that he does not contend that the BCA erred in the processing of the DNA evidence in his particular case. Instead, Roman Nose contends that the BCA's methodology for DNA testing is unreliable in general because the manufacturer who produces the kits used to perform the DNA analysis has not released its primer sequences and the appropriate developmental validation studies have not been published. Roman Nose further contends that the state has "failed to demonstrate that there exist established standards for conducting PCR–STR tests or interpreting the results of such testing."

■ This court has addressed these issues in *State v. Traylor*. In *Traylor*, we determined that the BCA had demonstrated foundational reliability in its DNA testing by showing compliance with the DNA Advisory Board (DAB) standards, the current standards and procedures applicable to forensic laboratories doing DNA testing. 656 N.W.2d at 897–98. Roman Nose has not shown or argued that the BCA has not complied with the DAB standards in this case. We conclude, therefore, that the district court did not abuse its discretion when it concluded that the DNA evidence had foundational reliability under the second prong of the *Frye–Mack* standard and that the DNA evidence was admissible.

*Admissibility of Random Match Probability Statistics*

In the initial appeal to this court, Roman Nose argued that the BCA should not have been allowed to testify using random match probability statistics, also known as the product rule, that there was a 1 in 63 trillion probability that a randomly selected person would have the same DNA profile as Roman Nose or Stuedemann.[3] We now address this issue.

In Roman Nose's initial arguments to this court, he asserted that this court recognized potential sources of error in computing probability figures in *State v. Bloom*, 516 N.W.2d 159, 160–62 (Minn. 1994), but, nevertheless, upheld use of the "interim ceiling method" recommended by the National Research Council (NRC) because it "is a conservative method of statistical calculation designed to favor the defendant." Because the DNA probability statistics were calculated under the product rule and not the interim ceiling method, Roman Nose argued that the DNA probability statistics should not be admissible. Roman Nose also argued against the use of the product rule based on findings by an outside consultant that there were disparities and significant linkage disequilibrium in the BCA's databases.

■ In response, the state asserted that the interim ceiling method approved in *Bloom* was not used with the PCR–STR method of DNA testing because of technological advancements. Further, the state argued that the product rule had been recommended by the NRC in their updated report issued in 1996 for PCR–STR testing and it was, therefore, a proper means of presenting the probability of a random match.[4] As for the BCA's data-

---

3. Under the product rule, the probability of a random match at each loci is multiplied together.

4. In the initial appeal to this court, the state asserted that "[n]ormally, the BCA reports their findings from the product rule by stating that the DNA profile is not expected to occur more than once among unrelated individuals in the world population. However, Appellant chose to have Ms. Schoenbauer testify as to the actual statistical frequency in this case." With these statements, the state appears to argue that Roman Nose requested that the actual statistic generated by the product rule—the 1 in 63 trillion—be used and therefore, cannot now protest its use. Roman

base, the state asserted that any departures from linkage equilibrium would have a "relatively minor effect" on the product rule.

On remand, both parties presented additional testimony and evidence on the alternative probability statistics used in the presentation of DNA evidence. Based on this additional evidence, the district court made supplemental findings and conclusions on the presentation of DNA evidence. In its supplemental findings, the court concluded that for single source samples, the product rule was generally accepted in the forensic scientific community as producing results that are scientifically reliable as accurate. For mixtures, however, the court concluded that, except in limited cases, the results of DNA identity analysis should be presented using the Combined Probability of Exclusion (CPE) [5] or the Likelihood Ratio (LR) [6] calculation and not the product rule. In reaching these conclusions, the court did not state

that it erred when it allowed the state to present DNA evidence using the product rule at trial. In this appeal, both parties have provided supplemental arguments on the statistics used in the presentation of DNA evidence based on the additional findings and conclusions made by the district court.

■ On remand, it is the duty of the district court to execute the mandate of this court strictly according to its terms. *Halverson v. Village of Deerwood*, 322 N.W.2d 761, 766 (Minn.1982). "The trial court has no power to alter, amend, or modify [this court's] mandate." *Id.* (citing *Tankar Gas, Inc. v. Lumbermen's Mut. Cas. Co.*, 215 Minn. 265, 9 N.W.2d 754 (1943)).

■ After our initial review, we remanded this case to the district court "for a hearing on whether the PCR–STR method of testing DNA has gained general acceptance within the relevant scientific

Nose's motion in limine regarding this issue indicates that Roman Nose requested that the district court "prohibit the admissibility of a single frequency statistic and rather limit the state to presenting the statistical frequencies of each individual allele. In the alternative, defense requests an order by the [c]ourt prohibiting the state from using the language, 'not likely to reappear in the population' and limiting statistical evidence to the actual frequency found." While it is unclear what exactly Roman Nose meant by his request in the alternative for the statistical evidence to be limited to the "actual frequency found," Roman Nose consistently asked the court to prohibit use of the product rule in his motion. Thus, we cannot say that Roman Nose requested the use of the product rule and therefore cannot now challenge it on appeal.

5.  The CPE method "provides an estimate of the portion of the population that has a genotype composed of at least one allele not observed in the mixed profile." DNA Advisory Board, *Statistical and Population Genetics Issues Affecting the Evaluation of the Frequency of Occurrence of DNA Profiles Calculated*

*from Pertinent Population Database(s)*, Forensic Science Communications, 2, July 2000, at 5, available at *h ttp://www.fbi.gov/hq/lab/fsc/backissu/july2000/dnastat.htm*. The advantages of the CPE method are: (1) it is a conservative estimate; (2) knowledge of the accused or the victim profiles is not used or needed in the calculation; and (3) no assumptions are required about the identity or number of contributors to the mixture. *Id.*

6.  The LR method "provides the odds ratio of two competing hypotheses, given the evidence." DNA Advisory Board, *supra* note 5, at 5. According to Dr. Bieber, typically the numerator of the ratio would be the probability of observing the evidence given the mixture is comprised of the victim and the defendant over the denominator which is the probability of observing the evidence if the mixture is comprised of the victim and some other unknown person. Unlike the CPE method, the LR method requires a hypothesis about the number of contributors and who they are. *Id.* at 5–6.

community," not on the statistics used to present DNA evidence. *Roman Nose*, 649 N.W.2d at 823. The district court, itself, acknowledged in its order that its supplemental findings and conclusions on the probability statistics "are more relevant to the weight to be given PCR–STR analysis than to the general acceptance of such analysis" and that some of the evidence received was beyond the scope of the hearing ordered. We hold that the DNA statistical testimony and additional DNA statistical evidence along with the district court's supplemental findings and conclusions relating thereto exceeded the scope of remand.

Having reached this conclusion, we must then decide to what extent, if any, we consider the additional information presented on probability statistics in addressing Roman Nose's challenge to the use of the product rule. We have in the past refused to consider findings made by a district court that exceeded the scope of remand even if such findings were supported by the record. *See Interstate Power Co., Inc. v. Nobles County Bd. of Comm'rs*, 617 N.W.2d 566, 580 (Minn.2000) (concluding that additional reasons for denial of a conditional use permit (CUP) not raised in the initial proceedings could not be used to support denial of the CUP because they were beyond the scope of remand); *Sefkow v. Sefkow*, 427 N.W.2d 203, 213 (Minn.1988) (concluding that the district court erred in determining the custody of a sibling because it was beyond the scope of remand). Policy considerations further support this conclusion. If we were to consider additional evidence presented beyond the issue to be determined on remand, the parties might consider the remand proceedings to be a "second bite at the apple" and attempt to further litigate all issues in the case. Additionally, if the focus of the proceeding on remand is on a specific issue and one of the parties is allowed to introduce evidence on a second issue, the opposing parties may not be adequately prepared to address the second issue, and we may make conclusions based on incomplete information.

■ We therefore conclude that the additional testimony and evidence presented on probability statistics at the hearing on remand will not be considered in resolving the question of whether the district court abused its discretion when it allowed DNA evidence based on the product rule. Accordingly, we will limit our review to the record as it was at the time of the original appeal to this court.

The record reveals that the district court had the following information available to it at trial. Prior to 1994, this court had consistently limited the admissibility of statistical population frequency evidence. *See State v. Joon Kyu Kim*, 398 N.W.2d 544, 548 (Minn.1987); *State v. Boyd*, 331 N.W.2d 480, 483 (Minn.1983); *State v. Carlson*, 267 N.W.2d 170, 176 (Minn.1978). In *Carlson*, we held that the district court erred when it allowed expert testimony that there was a 1–in–800 chance that the pubic hairs found on the victim were not the defendant's and a 1–in–4,500 chance that the head hairs found clutched in the victim's hand were not the defendant's. 267 N.W.2d at 176. In *Boyd*, we held that testimony that none of the tests excluded the defendant was admissible, but that probability evidence of a 99.911 percent likelihood of paternity based on blood test results was inadmissible. We noted that:

> [T]here is a real danger that the jury will use the [statistical population frequency] evidence as a measure of the probability of the defendant's guilt or innocence and that the evidence will thereby undermine the presumption of innocence, erode the values served by

the reasonable doubt standard, and dehumanize our system of justice. 331 N.W.2d at 483. In *Kim*, the state attempted to introduce expert testimony that the semen found in the victim's body and on a bed sheet was consistent with Kim's blood type and that 96.4 percent of the males in the Twin Cities could be excluded as possible sources of the semen found on the bed sheet. 398 N.W.2d at 547. In that case, we reasoned that:

> As in *Boyd*, the expert called by the state in this case should not be permitted to express an opinion as to the probability that the semen is Kim's and should not be permitted to get around this by expressing the opinion in terms of the percentage of men in the general population with the same frequency of *combinations* of blood types. The expert should be permitted to testify, however, as to the basic theory underlying blood testing, to testify that not one of the individual tests excluded Kim as a source of the semen and to give the percentage of people in the general population with each of the *individual* blood types, and to express an opinion that scientific evidence is consistent with Kim having been the source of the semen.

*Id.* at 549 (emphasis in original).

In 1994, we created a DNA exception to the rule against admission of statistical probability evidence in criminal prosecutions to prove identity in *Bloom*. 516 N.W.2d at 160. In creating this new DNA exception, we noted that the justification for the exception was "the National Research Council's [NRC's] recent adoption of the conservative 'interim ceiling method' for computation of the probability that a randomly selected person would have the same DNA profile as that of a sample of bodily fluids found at a crime scene." *Id.* Under the DNA exception, we held that if the evidentiary foundation was sufficient, a properly qualified expert could give an opinion as to the random match probability using the NRC's [interim ceiling method] approach and not be limited to stating that the DNA test results are merely consistent with the defendant being the source of the evidence. *Id.* at 167–68. We further held, however, that the expert should not be allowed to testify that a particular profile is unique, state that the defendant is the source to the exclusion of all others, or express an opinion as to the strength of the evidence. *Id.* at 168.

Subsequent to *Bloom*, the NRC re-examined the use of the ceiling principles, which include the "interim ceiling method," in calculating the product rule in its 1996 report. National Research Council, *The Evaluation of Forensic DNA Evidence* 156–159 (1996). The NRC concluded that the ceiling principles were not applicable to PCR-based systems. *Id.* at 158. The NRC further determined that the procedures recommended in Chapter 4 of the report "encompass suitable degrees of conservatism" and that with such procedures available, the interim ceiling principle was no longer necessary. *Id.* at 159. One of the recommendations made by the NRC in Chapter 4 was that "[i]n general, the calculation of a profile frequency should be made with the product rule."[7] *Id.* at 122.

---

7. The full text of the NRC recommendations in Chapter 4 are as follows:

> Recommendation 4.1: In general, the calculation of a profile frequency should be made with the product rule. If the race of the person who left the evidence-sample DNA is known, the database for the person's race should be used; if the race is not known, calculations for all racial groups to which possible suspects belong should be made. * * *

> * * * *

> Recommendation 4.2: If the particular subpopulation from which the evidence

In addition to adopting the adjustments recommended by the NRC in its 1996 report, the BCA also adjusted its use of the product rule in accordance with recommendations made by the outside consultant who found departures from linkage equilibrium in the BCA's database. Given our holding in *Bloom*, the new recommendations from the NRC, and the BCA's use of an outside consultant to ensure accurate reporting of information, the district court could have reasonably concluded at the time of trial that the use of the product rule to report DNA evidence was appropriate.

■ We recognize that use of the product rule to present DNA evidence results in extremely large numbers and because of the large numbers, the concern that we articulated in *Boyd* is still there—that the jury will use the probability evidence as a measure of the probability of the defendant's guilt or innocence, thereby undermining the presumption of innocence. We further cautioned district courts in *State v. Kromah* to "be mindful of the potential impact such numbers may have on jurors" and noted that courts should "take steps to ensure that the presentation of the statistical evidence is not unfairly prejudicial or misleading." 657 N.W.2d 564, 567 n. 4 (Minn.2003). While recognizing the potential impact the large numbers generated by use of the product rule may have on jurors, we also recognize that the scientific community has approved the use of the product rule for analysis of results obtained from the PCR–STR method of testing DNA, and we have continually looked to the scientific community for guidance in resolving difficult issues such as these. Further, the record indicates that Schoenbauer's testimony that the probability of a match was 1 in 63 trillion was made as part of her overall presentation of DNA results and was not highlighted or emphasized above her other conclusions, thereby increasing the likelihood that jurors would place undue weight on the statistical results. We therefore conclude that the DNA probability statistics were not presented in a prejudicial or misleading manner and that the district court did not abuse its discretion in admitting DNA probability statistics using the product rule in this case.

■ Because of the "danger that juries will misunderstand, place undue weight on, or make inappropriate inferences from *statistical probability* testimony," Roman Nose contends that if we conclude that the statistical probability testimony is admissible, the district court should have provided cautionary jury instructions such as those proposed in Justice Page's concurring opinion in *Bloom*.[8] The district court con-

---

sample came is known, the allele frequencies for the specific subgroup should be used as described in Recommendation 4.1. If allele frequencies for the subgroup are not available, although data for the full population are, then the calculations should use the population-structure Equations 4.10 for each locus, and the resulting values should then be multiplied.

\* \* \* \*

Recommendation 4.3: If the person who contributed the evidence sample is from a group or tribe for which no adequate database exists, data from several other groups or tribes thought to be closely related to it should be used. The profile frequency should be calculated as described in Recommendation 4.1 for each group or tribe.

\* \* \* \*

Recommendation 4.4: If the possible contributors of the evidence sample include relatives of the suspect, DNA profiles of those relatives should be obtained. If these profiles cannot be obtained, the probability of finding the evidentiary profile in those relatives should be calculated with Formulae 4.8 or 4.9.

National Research Council, *supra*, at 122–23.

**8.** In *Bloom*, Justice Page recommended that when random match probability statistics are

cluded that such cautionary jury instructions were not necessary in this case. The court believed that such an instruction would highlight the importance of DNA opinion evidence over other scientific opinion evidence such as the medical examiner's analysis of the condition of the victim's body and the BCA's fingerprint analysis. Furthermore, the court believed an instruction on expert testimony sufficiently covered the topic.[9] While courts may disagree whether cautionary jury instructions are required when DNA evidence is presented, we cannot say the district court abused its discretion in failing to provide cautionary jury instructions in this case.

Although we have not considered the additional evidence on probability statistics presented at the hearing because it exceeded the scope of the remand, we note that consideration of that evidence would not have produced a different result. The additional evidence supports the conclusion that use of the product rule is appropriate when applied to a known single source sample, and Roman Nose concedes the validity of that conclusion in his brief by acknowledging that "a random match probability statistic [product rule] is scientifically acceptable when applied to a known single source sample * * *." Of the eight items on which DNA testing was performed, six items involved single-source samples and two items involved mixtures in which a predominant DNA profile could be identified. While the use of the product rule in mixtures where a predominant contributor has been identified may be subject to some debate,[10] we note that the DNA results from the six single-source samples are sufficient to implicate Roman Nose in Stuedemann's killing.

used, jurors should, at a minimum, be provided the following:

(1) A given DNA profile may be shared by two or more people;

(2) The random match probability statistic is not the equivalent of a statistic that tells the jury the likelihood of whether the defendant committed the crime;

(3) The random match probability statistic is the likelihood that a random person in the population would match the characteristics that were found in the crime scene evidence and also in defendant's DNA;

(4) Where the known DNA sample from the defendant matches the unknown sample obtained from the crime scene, it does not necessarily mean the defendant is the source of the sample found at the crime scene; and

(5) That jurors alone have the final responsibility to decide the weight to be given to DNA random match probability statistics. 516 N.W.2d at 171 (Page, J., concurring specially).

9. The court instructed the jury:

A witness who has special training, education, or experience in a particular science, occupation, or calling is allowed to express an opinion as to certain facts. In determining the believability and weight to be given such opinion evidence you may consider the education, training, experience, knowledge, and ability of the witness; the reasons given for the opinion; the sources of the information; factors already given you for evaluating the testimony of any witness. Such opinion evidence is entitled to neither more nor less consideration by you than any other evidence.

10. Two of the state's experts testified that if the mixture was such that two profiles were clearly identifiable and one of the profiles could be identified coming from the victim, then the second profile could be treated as a single-source calculation and the product rule could be used to present the DNA evidence. DAB guidelines consistent with that testimony were introduced into evidence. DNA Advisory Board, *supra* note 5, at 5.

One of the defense experts testified that all three statistical methods—product rule, CPE, and LR—are generally accepted in the scientific community for reporting mixtures, another testified that it was never appropriate to use the product rule when reporting a mixture, and another testified to the use of the product rule for single-source sample and the CPE method for all mixtures.

*Admissibility of Testimony that BCA Saves Half of the Sample for Defense*

Roman Nose next contends that the district court erred when it allowed Schoenbauer to testify on redirect examination that it is BCA policy to save half of every DNA sample so that a defense expert can perform his or her own testing on the DNA sample.[11] In support of his argument, Roman Nose points to our rulings in *State v. Porter*, 526 N.W.2d 359, 365 (Minn.1995), and *State v. Jobe*, 486 N.W.2d 407, 418 (Minn.1992), in which we concluded that a prosecutor may not comment on a defendant's failure to call witnesses or to contradict testimony because such comments might lead the jury to believe that the defendant has a duty to call witnesses or bears some burden of proof.

In response, the state contends that we permitted precisely the same kind of question in *Jobe*. In *Jobe*, after defense counsel suggested that there would not be sufficient blood remaining for retesting after the state concluded its testing, the prosecutor asked the state's blood expert if there would be sufficient blood to test. 486 N.W.2d at 418. The prosecutor also asked the defense's DNA expert, who was critical of the FBI's DNA testing procedures, whether he could do the same testing procedure in his laboratory if he had samples. *Id.* We concluded that the challenged questions were not as explicit as those comments that we held improper in *State v. Caron*, 300 Minn. 123, 126, 218 N.W.2d 197, 199 (1974),[12] nor did they make "the slightest suggestion that appellant was obligated to pursue independent testing," and consequently, the questions did not impermissibly shift the burden of proof. *Jobe*, 486 N.W.2d at 418.

Roman Nose contends that the circumstances in *Jobe* are different from those in this case. Roman Nose asserts that his counsel never suggested that he could not conduct his own DNA testing as the prosecutor did in *Jobe*, 486 N.W.2d at 418, and therefore, there could be only two possible reasons for the prosecutor's question—the prosecutor must have either intended to imply that Roman Nose had some obligation to independently conduct DNA testing or that the jury could draw an adverse inference from his failure to do his own testing, both of which are improper inferences.

▮▮▮ The record indicates that in the cross-examination of Schoenbauer, defense counsel questioned Schoenbauer about BCA's policy for assigning forensic scientists to a case and determining which samples of those collected would be tested for DNA. Then, seeming to challenge the thoroughness and competency of Schoenbauer's DNA testing, defense counsel questioned Schoenbauer about samples taken at the crime scene on which DNA testing was not performed.[13] On redirect

---

**11.** Specifically, in questioning Schoenbauer the prosecutor asked, "Okay. Is it BCA's policy to allow evidence, such as what we have here that you've tested, accessible to any other individual, any other experts, for retesting?" At that point the defense objected to the question and the district court judge overruled the objection. Schoenbauer then responded, "BCA policy is to save half of every sample in order for an expert from the defense, if desired, to retest those items."

**12.** In the state's closing argument in *Caron*, the prosecutor questioned why the defendant did not present certain alibi witnesses. 300 Minn. at 126–27, 218 N.W.2d at 200. We concluded that the comments of the prosecutor in *Caron* were improper, but that a new trial was not warranted because the error was harmless and the defendant did not object at trial or seek curative instructions. *Id.* at 127–28, 218 N.W.2d at 200–01.

**13.** Schoenbauer testified that the BCA generally does not do DNA testing on all samples

examination, the prosecutor then asked Schoenbauer about BCA's policy of preserving part of the sample so that others, including the defense, could perform retesting on the samples tested by the BCA. The record, therefore, indicates that the prosecutor's question was at least in part a response to Roman Nose's argument that the state's evidence was insufficient because the BCA failed to test all of the samples taken from the crime scene.

While we are concerned about the prosecutor's question regarding the defense ability to retest the sample, the district court could have concluded that the prosecutor's question was in response to Roman Nose's attack on the adequacy of the BCA's DNA testing and not intended to suggest that Roman Nose should have conducted his own testing. We cannot say that the court abused its discretion in allowing the prosecutor's question. The prosecutor's question did not impermissibly shift the burden of proof.

*Admissibility of Picture*

The district court allowed the state to admit a picture found in Roman Nose's bedroom that depicted a suspended human form with arms extended and stars trailing from the hands, concluding that the picture was relevant because the image on the picture was strikingly similar to the position in which the victim's body was found. Roman Nose contends that the district court erred when it admitted the picture because the picture in no way suggests that the human body pictured was a victim of sexual assault and is therefore, irrelevant to his case. Moreover, even if the picture had some minimal relevance, Roman Nose argues that its potential prejudice outweighs any probative value it may have.

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Minn. R. Evid. 401. A review of the image in the picture and a picture of the victim's body at the scene indicates that there is some similarity between the position of the body and the image of the human form suspended in the picture on Roman Nose's wall. While it is arguable whether this similarity is relevant or not, we cannot conclude that the district court's ruling that the similarity was relevant was an abuse of discretion.

Relevant evidence, however, may still be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." Minn. R. Evid. 403. Roman Nose contends that the probative value of the picture was outweighed by its potential prejudice because the jury could have inferred that someone who collected such pictures has the personality of a rapist or killer. However, as Roman Nose himself argued, there is no indication, in looking at the picture in isolation, that the figure depicted in the picture was the victim of sexual assault. It is only when viewed in relation to the position of Stuedemann's body that the probative value of the picture is apparent. In that context, we cannot say that the district court erred when it concluded that the probative value of the picture was not outweighed by its potential for unfair prejudice. Therefore, we conclude that the district court did not abuse its discretion when it determined that the picture was admissible.

## II.

In addition to challenging the district court's admission of evidence, Ro-

---

received due to cost and time limitations. Instead, the decision of which samples to test is determined by discussion between the investigator, a crime scene leader, and the forensic scientist.

man Nose contends that the prosecutor committed misconduct by misstating key testimony and misleading the jury about inferences it could draw from the evidence during closing argument.[14] "This court reviews claims of prosecutorial misconduct and will reverse only if the misconduct, when considered in light of the whole trial, impaired the defendant's right to a fair trial." *State v. Powers*, 654 N.W.2d 667, 678 (Minn.2003) (citing *State v. Johnson*, 616 N.W.2d 720, 727–28 (Minn.2000)). In determining whether prosecutorial misconduct deprived a defendant of a fair trial, there are two distinct standards. *Id.* In cases in which the misconduct was serious, the standard is whether the misconduct is harmless beyond a reasonable doubt. *Id.* "[M]isconduct is harmless beyond a reasonable doubt if the verdict rendered was surely unattributable to the error." *Id.* (citing *State v. Hunt*, 615 N.W.2d 294, 302 (Minn.2000)). In cases involving less serious misconduct, the standard is whether the misconduct likely played a substantial part in influencing the jury to convict. *Id.*

*Improper Statement of DNA Evidence*

Roman Nose asserts that the prosecutor committed misconduct in five respects. First, Roman Nose contends that the prosecutor suggested in closing argument that Roman Nose was the source of the DNA to the exclusion of all others in violation of our holding in *Bloom*. Specifically, Roman Nose challenges the following statements made by the prosecutor:

Everywhere you look, everywhere you look it's the defendant's semen. Everywhere you look. The only place, the only place you see anyone else's semen identified in the unrefuted DNA evidence is right here in the vaginal swab

where it indicates that the weaker identified by the expert is possibly Mr. Reiman's and the victim, a combination. * * *

The defendant is the only source of the perineal swab. It's only the defendant.

The blood and the semen identified on the boxer shorts, it's only the defendant. The blood is a mixture of the defendant and the victim.

* * * *

What do we know about the presence of the semen? We know that there's only two, two possible contributors to that semen. Two. No other evidence here that there's any other contributor to that semen. None, zero. Two contributors: Andy Reiman and the defendant.

* * * *

Who raped Jolene Stuedemann? Andy Reiman had consensual sex with his girlfriend that night. He told you that under oath on that witness stand. * * * That explains Andy Reiman. That's [sic] explains why his semen's in there.

There's only one other contributor. Right there. You're looking at him. Andy Reiman didn't rape Jolene Stuedemann. You are led to the inescapable conclusion that she was raped by this man. Nobody else. There's no other contributor of that semen. Nobody.

And we know, and we know that who raped her also killed her. One follows the other. They're inseparable. Who raped her killed her.

In *Bloom*, we held that properly qualified DNA experts may, assuming adequate foundation, "express an opinion that, to a reasonable scientific certainty, the defen-

**14.** Roman Nose did not raise specific objections to the prosecutor's closing arguments that he now challenges on appeal but instead raised a general objection after conclusion of the closing arguments.

dant is (or is not) the source" of DNA found at the crime scene. 516 N.W.2d at 168. We also concluded that the expert should not "be allowed to say that defendant is the source to the exclusion of all others or to express an opinion as to the strength of the evidence." *Id.* The prosecutor's comments that nobody other than Roman Nose contributed to the semen and that it was "only the defendant" are close to being a statement that the DNA samples matched Roman Nose's "to the exclusion of all others." However, when we concluded in *Bloom* that an expert should not "be allowed to say that defendant is the source to the exclusion of all others," we were addressing expert testimony. 516 N.W.2d at 168. An expert's testimony would undoubtedly be viewed with greater credibility than a prosecutor's closing argument and therefore deserves closer attention.

■ Moreover, we have stated that the prosecutor may present to the jury all legitimate arguments on the evidence, analyze and explain the evidence, and present all proper inferences to be drawn from the evidence. *State v. Starkey,* 516 N.W.2d 918, 927–28 (Minn.1994) (quoting *State v. Wahlberg,* 296 N.W.2d 408, 419 (Minn. 1980), and finding no prosecutorial misconduct when prosecutor in closing allegedly disparaged the role of defense counsel and asserted his opinion concerning the credibility of a witness). The record indicates that Schoenbauer testified that DNA testing on the semen found on the vaginal swabs indicated that the predominant DNA profile matched Roman Nose and that she could not eliminate Stuedemann or Reiman as possible contributors to the weaker DNA profile. Based on this testimony, the prosecutor's comments that the DNA results indicated that there were only two possible contributors to the semen found at the scene and that those

contributors were Reiman and Roman Nose would not be considered misstatements. Further, the prosecutor did not make an improper inference by asserting that because the DNA profiles derived from the semen samples matched only Roman Nose and Reiman and the presence of Reiman's semen was explained by Reiman's testimony that he had consensual sex with Stuedemann earlier in the evening, the jury could infer that it had to have been Roman Nose who raped and killed Stuedemann. That was, in fact, the prosecution's theory of the case. Therefore, we hold that the prosecutor's comments did not constitute prosecutorial misconduct.

*Misrepresentation of DNA Evidence*

■ Roman Nose next asserts that the prosecutor misrepresented Schoenbauer's testimony about the blood on Roman Nose's boxer shorts when the prosecutor told the jury that it *was* Stuedemann's blood. Roman Nose contends that Schoenbauer actually testified that the nonsperm cell fraction found on the boxer shorts was a DNA mixture matching Roman Nose and Stuedemann's DNA profiles, and that the DNA could have come from epithelial and carryover sperm cells from a sexual act, and not the blood. Consequently, Roman Nose contends that the prosecutor could not conclusively state that Stuedemann's blood was on the boxer shorts.

A review of Schoenbauer's testimony indicates that the boxer shorts contained a mixture of semen and blood. Schoenbauer testified that she was able to extract the mixture into a sperm cell fraction and a nonsperm cell fraction. DNA analysis on the nonsperm cell fraction indicated that the nonsperm cell fraction contained a mixture of DNA that was consistent with being from Roman Nose and Stuedemann. On cross-examination, Schoenbauer testi-

fied that it was possible that the mixture of Stuedemann's and Roman Nose's DNA profiles in the nonsperm cell fraction came from epithelial cells and some carryover sperm cells from a sexual act and not from the blood found on the boxer shorts. Therefore, Roman Nose is correct that it is possible for Stuedemann's DNA profile to appear in the mixture found on Roman Nose's boxer shorts, even though the blood was not from Stuedemann. However, it is also possible that the blood is from Stuedemann and is the reason that her DNA profile appeared in the mixture. As noted above, the prosecutor may present all legitimate arguments and draw reasonable inferences based on the evidence presented to the jury in support of his theory of the case. Because the record supports the possible inference that Stuedemann's DNA profile was found on Roman Nose's boxer shorts because it was her blood, we cannot say that prosecutor committed prosecutorial misconduct by his comments.

*Misrepresentation of Testimony on Fingerprint Analysis*

█ Roman Nose further contends that the prosecutor blatantly misrepresented the expert's testimony concerning the location of Roman Nose's fingerprint when the prosecutor stated in closing arguments that the fingerprint was found only after the paper was unraveled. A review of the record indicates that the fingerprint expert was asked on direct examination whether the latent fingerprint was revealed only after he pulled apart the folds of the crumpled up piece of paper. He responded that it was, and then went on to say that there were multiple layers of paper and that he could not conclusively say which layer the print was on. Based on that testimony, the prosecutor argued that the fingerprint was discovered only after the paper was unraveled because the print was made before the paper was crumpled up. The prosecutor's argument is a plausible theo-

ry that is based on the evidence available—evidence which the jury was free to accept or reject. Therefore, we hold that the prosecutor's remarks do not constitute misconduct.

*Improper Inferences Based on Blood on Shirt*

█ Roman Nose next contends that the prosecutor improperly told the jury that it could infer from the "spots of blood all over [Roman Nose's] shirt" that he killed Stuedemann. Citing to *State v. Moore*, Roman Nose contends that blood spatter interpretation must be based on expert testimony. 458 N.W.2d 90, 97 (Minn.1990).

In *Moore*, we recognized blood splatter analysis as a scientific technique. *Id.* We also noted that blood splatter analysis is "a simple way for crime scene investigators to determine the position of a victim's body by the placement and formation of the blood splatters at the time the wound was inflicted." *Id.* at 98. The prosecutor here, however, was not engaging in blood splatter analysis to prove the position of Stuedemann's body. Instead, the prosecutor was attempting to refute Roman Nose's testimony that he had merely wiped his hands on his shirt. The average juror, through experience and common sense and without expert testimony, could determine that the presence of spots of blood on the shirt is not consistent with Roman Nose's testimony that he wiped his bloody hands on his shirt. We, therefore, conclude that the prosecutor's comments do not constitute blood splatter analysis for which expert testimony is required. Accordingly, we conclude that the prosecutor did not commit misconduct by his comments.

*Improper Character Evidence*

Finally, Roman Nose argues that the prosecutor misused the picture from Ro-

man Nose's bedroom wall as improper character evidence. In closing arguments, Roman Nose points out that the prosecutor never argued the theory to the jury that was offered to the court to get the picture admitted—that the image on the picture was strikingly similar to the position in which Stuedemann's body was found. Instead, the prosecutor asserted that the picture demonstrated Roman Nose's values and identified his personality:

> And isn't it interesting what the defendant finds to be artistic? Isn't it interesting what the defendant pulls off of the internet and claims that I thought this was kind of neat and, you know, I wanted to use it for my class I was taking, and I think this is kind of artistic so I put it up on my wall. What do you have on your wall at home? What you have on your wall is what you value, what reflects your personality, what you appreciate, what's important to you. Your family, your loved ones. This is what he has on his wall. Is that a coincidence? Is that just mere happenstance? Absolutely not.

The prosecutor's use of the picture on the bedroom wall is troubling. Had the prosecutor only used the picture to draw a parallel between what was portrayed in the picture and how the victim was left at the crime scene, use of the picture would not have been misconduct. However, the prosecutor did not compare the picture to the position of Stuedemann's body for the jury, and instead stated, "[w]hat you have on your wall is what you value, what reflects your personality, what you appreciate, what's important to you." This appears to suggest that what a person has on the walls of his home indicates what kind of person he is. Such a suggestion is an improper character argument, and thus, we conclude that these state-

ments about the picture constitute prosecutorial misconduct.

We conclude that the prosecutor's comments about the picture and suggestion that the picture was indicative of Roman Nose's character were improper. We need not decide the level of seriousness of the misconduct because we conclude, given the overwhelming evidence of Roman Nose's guilt, that the jury's verdict was surely unattributable to the prosecutor's improper character argument and that the misconduct is harmless beyond a reasonable doubt.

### III.

Lastly, Roman Nose contends that the cumulative evidentiary errors committed by the district court and the prosecutorial misconduct denied him his right to a fair trial and, that therefore, he is entitled to a new trial. Because we conclude that the district court did not err in its evidentiary rulings and the prosecutorial misconduct consisted only of the prosecutor's statements that the picture found in Roman Nose's bedroom was an indication of Roman Nose's personality and values, which we hold to be harmless error, we conclude that Roman Nose was not denied his right to a fair trial. Accordingly, we affirm Roman Nose's conviction of murder in the first degree while committing criminal sexual conduct.

Affirmed.